**UNION PACIFIC RAILROAD COMPANY**

v.

**UNITED STATES.**

No. 330–56.

United States Court of Claims.
May 6, 1959.

Laramore, J., dissented.

Raymond A. Negus, Washington, D. C., for plaintiff. Lawrence Cake and John Guandolo, Washington, D. C., were on the brief.

Lewis A. Dille, Kensington, Md., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

The single issue in this case is whether the transportation charges on the shipments involved should be based on domestic rates as plaintiff contends, or upon export rates, the basis on which payments were made.

The commodities involved were shipped from Arsenal and Ogden, Utah, to Seattle, Washington. The bills of lading showed on their face that the shipments were intended for export and were consigned to the Port Transportation Officer, Port of Embarkation, Seattle, Washington. The bills of lading were receipted for by the Port Transportation Officer. After delivery to the Port Transportation Officer, the shipments were loaded on ocean steamships for overseas destinations.

The plaintiff originally billed the Government and was paid freight charges based on the export rates provided in A.A.R. Section 22 Quotation No. 265–A, pertinent parts of which are set out in finding 3.

About two years later plaintiff filed supplemental bills claiming it was entitled to the domestic rates. The basis for the claim for the additional compensation was that the defendant had failed to furnish notices or export certificates showing that the shipments actually went into exportation. The port allowance of three cents per hundred pounds was refunded to plaintiff by supplemental payments.

By the terms of A.A.R. Section 22 Quotation No. 265–A the export rate was made available to the Government for shipments made to a port of embarkation destined for export but attached to and a part of the agreement was the provision that within 60 days after exportation an authorized Government representative would furnish the carrier a certificate to the effect that the traffic was loaded for a point within the destination area covered by TCFB Export Tariff 29-series. It was further provided that the certificate should be sufficiently specific to enable the accounting departments to determine what rates should be applied in cases where different rates were named in the export tariff for particular countries of destination and should show separately the traffic loaded at the port provided for in the Quotation and the name of the port through which the actual exportation was made.

As shown by finding 4, the carriers who were parties to the Quotation were to prepare bills initially for traffic identified as export on the basis of export rate, with an appropriate notation that the bills would be subject to correction if the certificate of exportation was not furnished within 60 days, and that in such event supplemental bills would be rendered for the difference between the Quotation rates and the charges under the regular domestic tariffs.

Admittedly this certificate or notice was not furnished within the 60 days stipulated in the schedule.

It is the contention of plaintiff that since the certificate was not furnished within 60 days the terms were not complied with and that the plaintiff was entitled to the domestic rather than the export rate. This suit is for the difference between the two rates.

It is the position of the defendant that the plaintiff had full knowledge that the shipment was intended for export; that the bills of lading so provided upon their face; that the shipments actually went into export; that all of the conditions were met except the actual giving of notice and that since plaintiff had knowledge that it was an ex-

port shipment there was substantial compliance with the conditions; that no damages resulted from the failure to give notice and that the primary purpose of notice was for the use of plaintiff's accounting department.

The question then is narrowed to the issue as to whether the failure to give the specific certificate was sufficiently vital to justify the allowance of the domestic rates rather than export rates on shipments that actually went into export, the single ground being that the notice or certificate was not actually furnished within the 60 days specified in the schedule.

When all the circumstances in this special case are considered and since there are no other complicating factors, we are inclined to agree with the position taken by the defendant. We base this conclusion purely upon the facts in this individual case which presents the naked issue as to whether the after-the-fact failure to give the notice or certificate was sufficient to justify the increase in rates.

The plaintiff already knew that the shipments were going into export. They actually went into export. It was some two years later that the claim was made on the basis indicated.

The plaintiff relies on our decision in the case of Union Pacific Railroad Company v. United States, 132 F.Supp. 230, 132 Ct.Cl. 213, but that case, it seems to us, is distinguishable. In that case there were many complicating factors, including the unloading and storage-in-transit privileges.

In reaching our conclusion we do not in any sense justify the defendant in failing to furnish the notice or certificate of exportation. It should have been furnished. It was apparently overlooked. We recognize that people do sometimes forget. One is reminded of the story of the dozing student who was suddenly asked by the professor the question, "What is electricity?" The young man, batting his eyes, said, "Doctor, I did know, but I forgot." To which the in-

structor replied, "Well, that is too bad, you are the only man in the history of the world who ever knew what electricity is and you forgot." In this instance, however, both parties apparently knew all the essential facts.

No real damage is done to anyone by applying the rates which the facts fully justify, except for the condition which has been mentioned. We find that the ends of justice are reached by denying recovery and that in the peculiar circumstances of this case it would not be just to allow the full recovery sought by the plaintiff.

It has been stipulated by the parties, as outlined in finding 11, that if the position of plaintiff is sustained it is entitled to recover the net sum of $14,-127.57, and that if the export rates are applied the defendant is entitled to recover against plaintiff the net sum of $1,227.01.

The petition is dismissed and defendant is given judgment against the plaintiff on its counterclaim in the sum of $1,227.01.

It is so ordered.

BRYAN, District Judge, sitting by designation, and MADDEN and WHITAKER, Judges, concur.

LARAMORE, Judge (dissenting).

I would require the Government to pay the domestic rate for failure to give the notice required by A.A.R. Section 22 Quotation No. 265–A. The Government should not be allowed to benefit from its failure to fully comply with the explicit and unambiguous terms of the agreement. In order to receive the benefit of the export rates the Government was required to give the 60-day notice of export. This it failed to do. We find no provision which says that because the shipments were actually exported, and this fact known to the carrier, the Government is relieved of the requirement of notice. Having failed in this respect, I believe the Government has forfeited its right to the lower rates.

### Findings of Fact

The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Wilson Cowen, makes the following findings of fact:

1. The plaintiff, a corporation of the State of Utah, is a common carrier by railroad over its own lines and in connection with other carriers.

2. During the year 1950, plaintiff performed transportation services for the Government by transporting various commodities on Government bills of lading from Arsenal and Ogden, Utah, to Seattle, Washington. The bills of lading show on their face that the shipments were intended for export and were consigned to the Port Transportation Officer, Seattle Port of Embarkation, Seattle, Washington, the inland rail destination. Each bill of lading was receipted for and accomplished by the Port Transportation Officer.

With respect to such shipments, the sole issue is whether the transportation charges should be assessed on the basis of the domestic rates, as plaintiff contends, or whether such charges should be assessed at the export rates provided in A.A.R. Section 22 Quotation No. 265–A and amendments thereto, as defendant urges.

3. On February 10, 1944, plaintiff and other carriers, which were parties to TCFB Export Tariff 29-series, offered to the War Department and other Government agencies, A.A.R. Section 22 Quotation No. 265, quoting the export rates published in TCFB Export Tariff 29-series (without land-grant deductions) on Government traffic to Pacific coast ports for export, without requiring compliance by the Government with items 235, 270, 275 and 290 of the said tariff. The quotation applied retroactively to Government traffic shipped from points of origin named in the tariff on or after January 1, 1942. This quotation was formally accepted by the War Department through its authorized representative, as well as by other Government agencies. On August 29, 1944, A.A.R. Section 22 Quotation No. 265–A was issued, cancelling A.A.R. Section 22 Quotation No. 265 and remained in effect with amendments during the period of the shipments herein.

The quotation provided in pertinent part as follows:

"For and on behalf of carriers by railroad parties to Trans-Continental Freight Bureau Westbound Tariffs hereinafter referred to, I am authorized to and do hereby quote and offer to the United States Government, pursuant to Section 22 of the Interstate Commerce Act, 49 U.S.C.A. § 22, the transportation services hereinafter described for the charges and under and subject to the terms and conditions herein stated.

"Item 1

"Rates currently in effect from time to time in Trans-Continental Freight Bureau Export Tariff 29-series (not subject to land-grant deduction) will be applied by the carriers on traffic shipped by or for account of the various Departments, Bureaus and Agencies of the United States Government, and on which the United States Government assumes the freight charges, moving from origins and to United States Pacific Coast Ports named in said tariff and forwarded overseas from such ports to the destination territory named in Trans-Continental Freight Bureau Tariff 29-series but without requiring compliance upon the part of the Government with Items Nos. 235, 270, 275 and 290 of said tariff. Carriers will accord like treatment to Government traffic shipped from said points of origin on and after January 1, 1942.

\*　\*　\*　\*　\*　\*

"Item 6, as amended by Amendments Nos. 3, 4, 5 and 6, is amended further to read:

"Item 6

"An authorized Government representative will furnish the Pacific Coast Terminal rail carriers within sixty (60) days (See Notes 1 and 2) after exportation a certificate to the effect that the traffic was loaded for a point within the destination area covered by Trans-Continental Freight Bureau Tariff 29-series and tender and acceptance of such certificate will be considered final by both Government and carrier as to destination. Said certificate should be sufficiently specific to enable Accounting Departments to determine what rate should be applied in those instances where different rates are named in the export tariff conditioned on the particular country or countries of destination, and should show separately tonnage loaded at ports provided for in Items 1, 2, and 4, respectively, and in addition name of the port through which actual exportation was made.

"Note 1. (a) The sixty (60) day limitation for certification will not apply to shipments which move from points of origin prior to March 1, 1944. Certificates covering such shipments must be furnished Pacific Coast Terminal rail carriers not later than June 30, 1946.

"(b) Certificates covering shipments which move from point of origin in period March 1, 1944, to May 31, 1945, inclusive, must be furnished Pacific Coast Terminal rail carriers not later than December 31, 1945.

"Note 2. When security regulations or other unavoidable conditions prevent filing certificates within the limitation of sixty (60) days, carriers will accept such certificates if filed within a period of not in excess of fifteen (15) additional days.

"Item 7

"Preservation of the exact identity of each inbound shipment is not required, but tonnage exported must be of the same quantity and character of traffic as handled into the depot or activity in the car specified in the certification of exportation."

4. On April 4, 1944, Mr. F. L. Mc-Caffrey of the Southern Pacific Company, wrote certain Government agencies requesting confirmation of the following agreement relative to the handling of shipments under A.A.R. Section 22 Quotation No. 265:

"(1) Government bills of lading covering export traffic will be marked 'Export' and promptly surrendered to carriers' freight agents at Pacific Coast ports.

"(2) Carriers will prepare bills initially for traffic identified as export on the basis of rates provided in Section 22 Quotation 265, with appropriate notation that bills will be subject to correction if export certificate is not furnished within required time, with the understanding that the Government will pay these bills promptly. If certificate of exportation is not furnished within the time specified, supplemental bill will be rendered against the Government for the difference between amount initially billed and charges at rates under domestic tariffs, or other A.A.R. Section 22 Quotations. Col. Williamson will handle with Mr. E. H. Bunnell, Vice President, Finance, Accounting, Taxation and Valuation Department, A.A.R., the question of filing blanket agreement to cover this.

"(3) Export certificates will be surrendered by Governmental agencies to local railroad agents on sixtieth day after exportation. Form similar to Treasury Department LL-216 is to be adopted by all branches of the Government. Certificates will carry initials and numbers of bill of lading, date surrendered, and car initials and number. Carriers will decline to accept certificates, as not valid, if the initials and number of

the Government bill of lading are not shown.

"(4) Local Governmental agencies will surrender to local railroad agents certificates on back business and the carriers will make refunds on receipt of certificates. Certificates will conform to Item 3.

"(5) Claims for amounts due Government on shipments moving on commercial prepaid bills of lading are to be filed with the initial line and will include the 3¢ allowance for terminal charges, if properly due."

5. After the shipments in controversy were delivered by plaintiff to defendant's Port Transportation Officer, the shipments were thereafter loaded on ocean steamships for overseas destination. The defendant did not issue or furnish to plaintiff any export certificates with respect to such shipments as required by item 6 of A.A.R. Section 22 Quotation No. 265–A.

6. Plaintiff originally billed the Government and was paid freight charges based on the export rates provided in A.A.R. Section 22 Quotation No. 265–A and amendments thereto.

7. Within 2 years after the transportation services had been performed, plaintiff filed supplemental bills predicated on the domestic rates. Since no export certificates had been furnished, plaintiff claimed that the export rate was not applicable. The supplemental billing was made pursuant to the procedure described in finding 4.

8. These supplemental bills were settled by the Government on the basis that the export rate was applicable under the terms and conditions of Trans-Continental Freight Bureau Tariff 29-series and the port allowance of three cents per hundred pounds was refunded to plaintiff by supplemental payments.

9. In view of this court's decision in Union Pacific Railroad Company v. United States, 132 F.Supp. 230, 132 Ct. Cl. 213, defendant in this action contends that the applicable rates on the shipments in dispute are the export rates provided in A.A.R. Section 22 Quotation No. 265–A and amendments thereto.

10. In addition to the shipments in issue, the petition covers nine bills of lading on which there is no controversy and with respect to which it has been agreed that there is due plaintiff the net sum of $245.65.

11. If it is held that the charges on the shipments in issue should be based upon the domestic rates, it has been stipulated that plaintiff is entitled to recover the sum of $13,881.92 thereon, plus $245.65 on the shipments not in dispute, or a total of $14,127.57. The parties have also agreed that if it is held that the transportation charges on the shipments in controversy should be based on the export rates provided for in A.A.R. Section 22 Quotation No. 265–A, the defendant is entitled to recover thereon the sum of $1,472.66, less the $245.65 referred to in the preceding finding, or a net amount of $1,227.01.

## Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed. The court further concludes that the defendant is entitled to recover on its counterclaim the sum of $1,227.01. It is therefore adjudged and ordered that the defendant recover of and from the plaintiff the sum of $1,227.01.