Durfee, Judge,
delivered the opinion of the court:
This case arose out of the performance by plaintiff for defendant of freight transportation services in connection *475 witli a number of shipments that moved during the period 1945-1951. Plaintiff contends that it has not received the full amount to which it was entitled for such services. Defendant, in a counterclaim, asserts that it overpaid plaintiff for the latter’s services in connection with the shipments mentioned in the petition, and that it is entitled to a judgment against plaintiff.
The freight charges for the transportation service so performed were billed by plaintiff on the basis of the export rate under the authority of the Transcontinental Freight Bureau Tariff 29 Series and AAR Section 22 Quotation No. 265-A, and were paid by defendant as billed.
Subsequent to the Government’s failure to file export certificates, as required by Item 6 of AAR Section 22 Quotation No. 265-A, plaintiff filed supplemental bills with the General Accounting Office for the difference between the export rate paid by the Government and the applicable domestic rate.
On October 2, 1956 this petition was filed by plaintiff, seeking to recover the difference between the domestic rate and the export rate. On May 6, 1959 this court determined in Union Pacific Railroad Company v. United States, 145 Ct. Cl. 619, 172 F. Supp. 668 (1959) that the Government was entitled to the export rate in Tariff No. 29-Series in conjunction with AAR Section 22 Quotation No. 265-A without complying with the terms and conditions of Item 6 of that quotation.
After examining the Government’s proof of exportation of the shipments herein, plaintiff conceded that the export rate was applicable in accordance with the court’s decision.
The issue that remains in the present case for consideration and disposition by the court was raised by defendant’s counterclaim.
The parties have agreed that plaintiff is entitled to the net amount of $960.56 on the claims asserted in the petition, other than the claims arising out of the 15 shipments that were involved in plaintiff’s bills Nos. W-245874, W-245956, and W-246278.
With respect to the 15 shipments that remain in controversy, the parties have agreed that the legal question to be *476 decided by tbe court is whether the military equipment that was involved in those shipments should:
(a) be rated under Item 1800 of Trans-Continental Freight Bureau Tariff No. 29-1 as “Freight Highway Vehicles with built-in and permanently attached machinery or machines, NOSor
(b) be rated under Item 28380 of the Consolidated Freight Classification as “Cranes, derricks, or power shovels, revolving or military bridge erecting, mounted on automobile or trailer truck, loose or in packages,” or
(c) be rated under Item 1470 of Trans-Continental Freight Bureau Tariff No. 29-1 as “Cranes or Derricks.”
The 15 shipments referred to as remaining in controversy involved the transportation of a type of military equipment which was described in some of the pertinent bills of lading as a “Freight Automobile (Truck Cargo) ” and in other bills of lading as a “Freight Automobile (Cargo Truck),” and which was identified by the Department of the Army in a pertinent supply catalog as a “TRUCK: * * * Cargo, Treadway, ES T-1959, 6 ton, 6x6, four d.t., 220 inch wheelbase, with front mounted winch, with hydraulic crane, all makes and models.” (The letters “ES” in the designation just quoted meant “Engineer Specification,” the letter “T” meant “Tentative” and the letters “d.t.” meant “dual tires.”) This piece of equipment was designed for use in military operations, its function being to transport a bay of vehicular treadway bridge, consisting of two treadways, the saddles, and the pontoon floats, and to provide mechanical assistance in connection with the handling and erection of the bridging materials. The Army procured the cargo-carrying body and the crane from one manufacturer, and procured the truck chassis from other manufacturers.
Defendant asserts in its counterclaim that it is entitled to recover the net sum of $4,596.94 since the shipments in question should have been classified under Item 1470 of the Trans-Continental Freight Bureau Tariff No. 29-1.
Alternatively, defendant asserts that if the above tariff does not apply, Item 28380 of the Consolidated Freight Classification is applicable, and defendant should recover $2,537.44.
*477 We think that defendant is incorrect in its contention that Item 1470 of Tariff No. 29-1 applies.
Item 1470 reads in pertinent part as follows:
Machinery or Machines or Parts thereof * * *:
❖
Cranes or Derricks (Subject to Note 4)
íjí 5|i
Note 4. — Does not apply on shipments moving on own wheels.
The item here in controversy is clearly not a crane or derrick. It is a truck, 6 ton, 6x6, bridge erecting, w/winch. Though the “vehicle is provided with a rear-mounted derrick operated by hydraulic hoists * * *” the generic term derrick does not adequately describe the equipment. On the other hand, Item 1800 upon which plaintiff relies, does no better in describing this machinery. This item is not a “Freight Highway Vehicle with built-in and permanently attached machinery or machines NOS;” [Emphasis supplied.]
But Item 28380 of the Consolidated Freight Classification does specifically describe the equipment here involved. In fact, in 1943 the War Department requested, and the railroads agreed, to amend Item 28380 CFC No. 15 to read “Cranes, derricks or power shovels, or military bridge erecting, mounted on automobile or trailer truck” [Emphasis supplied.] in order to add this particular military bridge erecting vehicle specifically. Item 28380 CFC, as thus amended, was thereafter issued with the approval of the Interstate Commerce Commission, dated March 1, 1943, and was in effect during the period of the shipments involved in this case. Quite clearly, the rule that a specific provision will cut across a more general provision and will be applied in a proper case, should be invoked here.
Plaintiff contends, however, that defendant’s alternative claim, founded as it is on Item 28380 of the Consolidated Freight Classification, seeks application of a domestic rate in lieu of the export rate. It argues that since defendant established the exportation of the shipments, defendant must accept an export rate, and cannot alternatively claim the *478 benefit of a domestic rate which lies between the export rate claimed to be applicable by plaintiff, and the export rate claimed to be applicable by defendant. To support this argument, plaintiff seems to rely on our prior decision in Union Pacific Railroad Co., supra. In that case, we held that where both parties knew that the shipments there in question were destined for export and were in fact exported, the Government’s failure to provide a notice certificate of export within the requisite sixty days was insufficient to deprive defendant of the benefit of the lower export rates. We do not think that decision establishes a controlling distinction between domestic and export rates. Rather, we think it merely upholds the accepted policy that defendant shall receive the benefits of the lowest rates available. This position is certainly supported by established precedent. When this court was faced with the choice of applying the higher domestic tariff or the lower export tariff in Western Pacific Railroad Co. v. United States, 150 Ct. Cl. 1, 279 F.2d 258 (1960), Judge Jones, speaking for the court stated (at 11) :
The tariff which Western Pacific advocates applies to domestic shipments. Therefore, it seems to us that we are asked to choose between two tariffs, one for domestic freight, the other for export freight, neither of which violates the meaning of Quotation No. 64-B. The list of iron and steel articles in both tariffs was similar, and apparently neither listed nor rated airplane landing mats.
It is a familar principle in construing freight tariffs that when two tariffs are equally appropriate the one which provides the shipper with the lower rate is to be applied. Moreover, there is language in each of the tariffs presented to us in connection with Group IV to the effect that on export traffic, a rate designated as an export rate will take precedence over other rates between the same two points.
The court went on to say that the choice of the lower tariff was buttressed in logic by the fact that the goods involved had been exported, and hence the export rate should apply.
The instant case differs from the cases cited above in that the domestic rate is the lower of the two rates. Moreover, there is no language in the tariffs here involved indicating *479 that the export rate should take precedence. In such a circumstance, should the lower domestic rate control or should the export rate control ? In keeping with the general rule that the shipper should benefit from the lowest rate, we think this factor of lowest applicable rate should control notwithstanding the exportation of the goods after delivery by the carrier to the domestic destination.
Our conclusion that the lowest rate applicable governs is particularly compelling in the instant suit. Item 28380 of the Consolidated Freight Classification was amended in 1943 to specifically and particularly cover the equipment here involved. In this situation, where the lowest rate available is also the rate devised to specifically apply to the item in question, there can be no doubt about its applicability.
The parties have agreed that if Item 28380 of the Consolidated Freight Classification is applicable, judgment should be entered for defendant on its counterclaim in the sum of $3,498 for the 15 shipments here in question, minus the $960.56 due plaintiff on the other claims asserted in the petition.
Since we hold that Item 28380 of the Consolidated Freight Classification is applicable, judgment is accordingly entered for defendant in the net sum of $2,537.44 in full settlement of all claims asserted by the parties in the petition and the counterclaim.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized aad existing under the laws of the State of Utah. It is a common carrier by railroad in interstate commerce over its own lines and jointly with other carriers.
2. During the years 1945 to 1951, inclusive, the plaintiff, as the final and delivering carrier, performed freight transportation services for the defendant from various points of origin in the United States to destination points on the plaintiff’s lines, in connection with 40 separate shipments that are involved in the present litigation.
*480 3. (a) The freight charges for the transportation services referred to in finding 2 were billed by the plaintiff and were paid by the defendant as billed. There were 14 bills covering the 40 shipments. Upon subsequent audit by the General Accounting Office, that office made adjustments in connection with a number of the charges. In some instances, the adjustments were made by means of deductions from amounts otherwise due the plaintiff with respect to transportation services not directly involved in this case. In other instances, the adjustments were accomplished by means of refunds demanded of and paid by the plaintiff. The payment and audit procedure was in accordance with the provisions of 49 U.S.C. 66.
(b) The petition was filed on October 2, 1956, to recover the amounts of the adjustments mentioned in paragraph (a) of this finding and, in addition, to recover the amounts of certain alleged undercharges and underpayments which (according to the plaintiff) had been made in connection with some of the original bills referred to in paragraph (a).
(c) The principal issue raised by the petition related to the failure of the Government to furnish export certificates, as required by Item 6 of AAR Section 22 Quotation No. 265-A. The shipments involving the principal question were initially billed and paid for on the basis of the export rate under the authority of Trans-Continental Freight Bureau Tariff 29 Series and AAR Section 22 Quotation No. 265-A. Subsequent to the Government’s failure to file export certificates, as required by Item 6 of AAR Section 22 Quotation No. 265-A, the plaintiff filed supplemental bills with the General Accounting Office for the difference between the export rate paid by the Government and the applicable domestic rate. However, the Government contended that it was entitled to the export rate under the authority of TCFB Tariff 29 without complying with the terms and conditions of Quotation No. 265-A. This action was then filed in the Court of Claims by the plaintiff. With respect to the principal issue, the petition sought to recover the difference between the domestic rate and the export rate in the Tariff 29 Series.
(d) On May 6,1959, this court determined, in another case styled Union Pacific Railroad Co. v. United States, 145 Ct. Cl. *481 619, that the Government was entitled to the export rate in the Tariff 29 Series, in conjunction with AAR Section 22 Quotation No. 265-A, without complying with the terms and conditions of Item 6 of that quotation.
(e) In view of the decision referred to in paragraph (d) of this finding, the plaintiff in the present case, after examination of the proof of exportation furnished by the Government, conceded that the export rate on the described commodities was applicable.
4. The issue that remains in the present case for consideration and disposition by the court (see findings 6-16) was raised by the defendant’s counterclaim.
5. The parties have agreed that the plaintiff is entitled to the net amount of $960.56 on the claims asserted in the petition, other than the claims arising out of the 15 shipments that were involved in the plaintiff’s bills Nos. W-245874, W-245956, and W-246278. Those 15 shipments are dealt with in findings 6-16.
6. The 15 shipments referred to in finding 5 as remaining in controversy involved the transportation of a type of military equipment which was described in some of the pertinent bills of lading as a “Freight Automobile (Truck Cargo)” and in other bills of lading as a “Freight Automobile (Cargo Truck),” and which was identified by the Department of the Army in a pertinent supply catalog as a “TRUCK: * * * Cargo, treadway, ES T-1959, 6 ton, 6x6, four d.t., 220 inch wheelbase, with front mounted winch, with hydraulic crane, all makes and models.” (The letters “ES” in the designation just quoted meant “Engineer Specification”; the letter “T” meant “Tentative”; and the letters “d.t.” meant “dual tires.”) This piece of equipment was designed for use in military operations, its function being to transport a bay of a vehicular treadway bridge, consisting of two treadways, the saddles, and the pontoon floats, and to provide mechanical assistance in connection with the handling and erection of the bridging materials. The Army procured the cargo-carrying body and the crane from one manufacturer, and procured the truck chassis from other manufacturers.
7. The articles involved in the 15 shipments mentioned in findings 5 and 6 were shipped by the Engineer Supply Sec *482 tion, Utah General Depot, Ogden, Utah, and were consigned to the Port Transportation Officer, Seattle Port of Embarkation, Seattle, Washington, for export during the month of January 1951.
8. With respect to the 15 shipments that remain in controversy, the parties have agreed that the legal question to be decided by the court is whether the military equipment that was involved in those shipments should:
(a) be rated under Item 1800 of Trans-Continental Freight Bureau Tariff No. 29-1 as “Freight Highway Vehicles with built-in and permanently attached machinery or machines, NOS”; or
(b) be rated under Item 28380 of the Consolidated Freight Classification as “Cranes, derricks or power shovels, revolving or military bridge erecting, mounted on automobile or trailer truck, loose or in packages”; or
(c) be rated under Item 1470 of Trans-Continental Freight Bureau Tariff No. 29-1 as “Cranes or Derricks.”
,9. With respect to the 15 shipments that remain in controversy, the parties have further agreed as follows:
(a) If Item 1800 of Trans-Continental Freight Bureau Tariff No. 29-1 is applicable, neither side is due anything in connection with the 15 shipments that remain in controversy; the defendant’s counterclaim should be dismissed; and judgment should be entered for the plaintiff in the sum of $960.56 under finding 5.
(b) If Item 28380 of the Consolidated Freight Classification is applicable, the defendant is due the net amount of $3,498 on its counterclaim in connection with the 15 shipments that remain in controversy; and judgment should be entered for the defendant in the net sum of $2,537.44 ($3,498 minus the $960.56 mentioned in finding 5).
(c) If Item 1470 of Trans-Continental Freight Bureau Tariff No. 29-1 is applicable, the defendant is due the net amount of $5,557.50 on its counterclaim in connection with the 15 shipments that remain in controversy; and judgment should be entered for the defendant in the net sum of $4,596.94 ($5,557.50 minus the $960.56 mentioned in finding 5).
*483 10. Item 1800 of Trans-Continental Freight Bureau Tariff No. 29-1 reads in pertinent part as follows:
Vehicles, self-propelling (except as otherwise provided) or PARTS THEREOF, VÍZ.:
*****
Automobiles, freight or passenger (Subject to Note 5) ,[1]
Freight Highway Vehicles with built-in and permanently attached machinery or machines, NOS [2] (Subject to Note 5) [1]
11. Item 28380 of the Consolidated Freight Classification reads in pertinent part as follows:
Machinery or Machines, or Parts Named * * * :
* * * * #
Cranes, derricks or power shovels, revolving or military bridge erecting, mounted on automobile or trailer truck, loose or in packages.
12. Item 1470 of Trans-Continental Freight Bureau Tariff No. 29-1 reads in pertinent part as follows:
Machinery or Machines or Parts thereof * * * :
»!» M
Cranes or Derricks (Subject to Note 4)
ifc jfc iji # Hí
Note 4. — Does not apply on shipments moving on own wheels.
13. On February 8, 1943, a representative of the Office of the Chief of Transportation, War Department, Washington, D.C., wrote the following letter to the Chairman of the Western Classification Committee in Chicago, Illinois:
The classification description and rating applicable to a military vehicle designated as a truck, 6 ton, 6x6, bridge erecting w/winch, picture of which is inclosed, has been referred to this office.
The above mentioned vehicle is commonly called a “hydraulic steel treadway handling device.” This vehi *484 cle is provided with a rear-mounted derrick operated by hydraulic hoists. Metal bridge sections can be quickly moved into position directly from the truck by use of the derrick. It is used in laying steel treadways on pneumatic floats for the crossing of streams by tanks and armored vehicles. The steel treadways are not shipped with the vehicles.
It is the opinion of this office that this vehicle is properly rated by analogy under item 28380, CFC No. 15. This office further believes that item 28380 should be amended to read as follows:
“Cranes, derricks or power shovels, revolving, or military bridge erecting, mounted on automobile or trailer truck”
in order to take cars of this particular vehicle specifically. This office at the present time does not know the exact volume of movement of this item, but believing that this is a duration movement only, there is no need for a new entry.
Your immediate reply will be appreciated.
14. Under the date of March 1,1943, the Chairman of the Western Classification Committee replied as follows to the letter quoted in finding 13:
Referring to your letter of February 8, file SPTOT 551.2-FR:
All territories have agreed to amend item 28380 of C.F.C. No. 15, as per your request.
15. On May 29, 1958, a representative of the General Accounting Office wrote the following letter to the Chairman of the Official Classification Committee:
Reference is made to item 28380-A of Supplement No. 28, dated May 29, 1943, to Consolidated Freight Classification No. 15, Greenly’s I.C.C. No. 59, covering ratings on “Cranes, derricks or power shovels, revolving or military bridge erecting, mounted on automobile or trailer truck, loose or in packages.” The above underscored portion of the item was an addition to the original item and was issued on a 5-day notice under permission of the Interstate Commerce Commission No. 14784, M-36979, dated March 1,1943.
Please furnish us with the history of the proceedings leading to the publishing of the above referred to change, together with a copy of your files indicating specifically what article or articles this change was intended to cover.
*485 16. Under the date of June 6, 1958, the following reply was made by the Official Classification Committee to the letter quoted in finding 15:
This has reference to your inquiry of May 29, _ file T-SR-09 853-PTS, wherein you request to be advised concerning Item 28380-A, Supplement 28, Consolidated Freight Classification No. 15 (present Item 60690, U.F.C. 4).
This amendment, as referred to in your letter, was a result of a request of the War Department, Office of the Chief of Transportation. The description was to apply, as specifically stated in the entry, on a military bridge erecting crane or derrick, mounted on an automobile trailer or truck.
If you desire more specific information concerning this particular equipment, we suggest you contact the Military Traffic Management Agency, referring to the correspondence which resulted in this change in 1943 under Office of the Chief of Transportation’s file SPTOT 551.2-FR.
CONCLUSION 0!F LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that defendant is entitled to recover on its counterclaim the amount due on the 15 shipments involved herein under Item 28380 of the Consolidated Freight Classification in the sum of $3,498 minus the amount due plaintiff on the other claims asserted in its petition in the sum of $960.56, and therefore judgment is entered for defendant in the net sum of $2,537.44 in full settlement of all claims asserted by the parties in the petition and the counterclaim.

 Note 5 Is not material to the Issue that is involved in the present litigation.

 “NOS” is defined in the tariff as follows:
“When used in connection with an article in an item carrying carload commodity rates, means not otherwise specified in this tariff, and any other item carrying carload commodity rates between the same points, whatever article, irrespective of package requirements.”